UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| EDMOND MESACHI,<br><br>       Plaintiff,<br><br>   v.<br><br>POSTMATES INC.,<br><br>       Defendant. | Case No.  3:20-cv-07028-WHO<br><br>**ORDER GRANTING MOTION TO COMPEL ARBITRATION**<br><br>Re: Dkt. No. 9 |

Plaintiff Edmond Mesachi worked as a courier for Defendant Postmates Inc.  He argues that it misclassified him as an independent contractor when he should have been classified him as an employee.  He tried to arbitrate this claim against Postmates, in line with an arbitration agreement he was bound by.  He eventually withdrew that arbitration and filed this suit because, he alleges, Postmates breached the arbitration agreement and waived its ability to arbitrate by failing to pay arbitration fees on time.

Both parties agree that they delegated questions of arbitrability to the arbitrator.  According to the Supreme Court's decision in *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63 (2010), Mesachi would have to challenge that delegation in particular for me to decide issues of arbitrability instead of an arbitrator.  He does not; his arguments would render the arbitration agreement unenforceable in its entirety.  As a result, the motion to compel arbitration is granted.

## BACKGROUND

Postmates is an online-based delivery service that permits consumers to select goods from nearby merchants to be delivered to them by Postmates's couriers.  *See* Complaint ("Compl.") [Dkt. No. 1] ¶¶ 55–60; Declaration of Jerica Sunga ("Sunga Decl.") [Dkt. No. 9-15] ¶ 2.  It maintains that these couriers are independent contractors.  *See, e.g.*, Motion to Compel Arbitration

and Stay Civil Proceedings ("Mot.") [Dkt. No. 9] 2.  Mesachi has worked as a Postmates courier for four years and alleges that couriers should properly be classified as employees, not independent contractors, under California law.  Compl. ¶¶ 161, 162–212.

Postmates requires people who sign up to be couriers to agree to Postmates's "Fleet Agreement."  Sunga Decl. ¶ 9.  The Fleet Agreement includes an agreement to arbitrate disputes arising from the courier job.  It permits couriers, however, to opt out of the arbitration provisions by providing notice within 30 days.  *See id.* Ex. B at 1.  Mesachi does not dispute that he agreed to the Fleet Agreement and did not opt out of the arbitration agreement.

The parties' dispute centers in part on their prior behavior in this proceeding and in related arbitrations.  In April 2020, Mesachi filed an arbitration demand against Postmates with the American Arbitration Association ("AAA").  *See* Sunga Decl. ¶ 24, Ex. F.  The arbitration agreement in effect provided that it would, generally, be governed by AAA Rules.  *See* Sunga Decl. Ex. D.  Mesachi alleged, as he does here, that Postmates misclassified him as an independent contractor and, among other consequences, underpays him.

In May 2020, Mesachi and Postmates received a letter from AAA declining to arbitrate the dispute.  *See* Sunga Decl. Ex. G.  AAA explained that Postmates "has not complied with our requests in the past to abide by" AAA's rules and AAA would not arbitrate any "employment-related claims involving" Postmates until it did so.  *Id.*  Mesachi claims that "AAA had invoiced and Postmates had refused to pay fees in thousands of other wage-theft arbitrations brought by other delivery drivers."  Plaintiff's Opposition to the Mot. ("Oppo.") [Dkt. No. 12] 2.  Postmates offers no alternative explanation and, indeed, there is evidence from other cases that Postmates has refused to pay these types of fees.  *See Adams v. Postmates, Inc.*, No. 19-3042 SBA, 2020 WL 1066980, at *1, *6 (N.D. Cal. Mar. 5, 2020) ("Postmates refused to pay any fees, claiming that the arbitration demands were insufficient under the terms of the Mutual Arbitration Provision and therefore the arbitrations had not been properly commenced.  The AAA disagreed and continued to demand payment of the fees.").

After AAA declined the arbitration, Mesachi filed suit in this court.  *See* Dkt. No. 9-2 (original complaint).  Postmates's counsel contacted Mesachi's counsel and told him that

1   Postmates would move to compel arbitration.  Declaration of Thomas R. Kayes ("Kayes Decl.")

2   [Dkt. No. 12-1] ¶ 5.  According to Postmates, the parties agreed that the judicial complaint would

3   be dismissed and the case would be arbitrated before JAMS.  *See* Declaration of Dhananjay S.

4   Manthripragada ("Manthripragada Decl.") [Dkt. No. 9-1] ¶ 3.

5          On June 1, 2020, Mesachi submitted his arbitration demand to JAMS—he says he did so to

6   "avoid delay."  Oppo. 3; *see* Dkt. No. 9-3.  On June 9, 2020, after the arbitration demand was filed

7   with JAMS, Postmates's counsel emailed Mesachi's and asked him to "let us know when you plan

8   to voluntarily dismiss Mr. Mesachi's pending case in N.D. Cal."  Kayes Decl. Ex. 1 at 3.[1]

9   Mesachi's counsel asked whether Postmates had "been issued an invoice and paid its filing fee?"

10  *Id.*  He explained in a follow-up email that, "I'll honor our agreement, but, based on past

11  experience, I don't believe they've accepted the case until they actually invoice Postmates."  *Id.* at

12  2.  He also offered to extend the time Postmates would have to respond to the complaint in court.

13  *Id.*  Postmates said it was "out of our hands when JAMS sends an invoice" and proposed

14  extending the time to respond in court.  *Id.*  Mesachi agreed.  *Id.*

15         On July 7, 2020, the parties again agreed to extend the time to respond in court because

16  Postmates had not received an invoice from JAMS.  *Id.* Ex. 2 at 2.  The next day, Mesachi's

17  counsel asked for an update from JAMS and, a week later, emailed JAMS again asking for an

18  estimate of when the invoice would be sent and trying to get the arbitration moving.

19  Manthripragada Decl. Ex. D.  On July 31, JAMS emailed the parties a Notice of Intent to Initiate

20  Arbitration.  *Id.* Ex. E.  That notice required Postmates to pay a $1,750 filing fee no later than

21  August 31, 2020.  *Id.* at 3.  The next day, JAMS sent an invoice to Postmates's counsel with the

22  counsel's name on the invoice.  *Id.* Ex. F at 5.  The attorney who received it responded, "[c]an you

23  please ask your billing department to revise the invoice so that it is addressed to Postmates instead

24  of me?  I'm happy to pass this along to them, but I believe they need this addressed to them in

25  order to process it."  *Id.* at 4.  In response to JAMS's subsequent request for contact information,

26  that attorney responded, "[f]ine to send the invoice to me and [another lawyer].  But instead of my

27

28  _____
    [1] Citations for the exhibits attached to declarations are to the ECF-generated page number.

United States District Court
Northern District of California

name at the top of the invoice, if you can put the below, that would be great." *Id.* at 3.

Mesachi's counsel asked on August 4, 2020, whether JAMS had sent the invoice. Kayes Decl. Ex. 3 at 2. He said, "[i]f they've sent you the invoice, please forward it to me and I'll file the dismissal." *Id.* On August 6, he followed up, reiterating that "[i]f they sent you the actual invoice, then I'll get the dismissal filed before your answer deadline Monday." *Id.* Ex. 5 at 2. Postmates's lawyer responded, "[a]ttached is the invoice that JAMS sent us." *Id.* Accordingly, Mesachi voluntarily dismissed the complaint. *Id.* ¶ 6.

By August 25, Postmates had not received an invoice with its name instead of its counsel's; it emailed JAMS for a status update. Manthripragada Decl. Ex. F at 3. JAMS responded that "[f]or all future billings," invoices would be sent to Postmates and attached the original invoice. *Id.* at 2. Postmates's counsel then spoke with a JAMS employee on the phone on September 8 and emailed Postmates contact information. *Id.* On September 17, JAMS sent two invoices to Postmates and its attorneys that had one of Postmates's attorney's name in the "Bill To" lines. *See id.* Exs. H, I; Sunga Decl. Ex. H. On September 21, Postmates's billing department contact JAMS and asked for an invoice that was to them, rather than the outside attorney. Sunga Decl. Ex. I. at 5. Postmates reached out again on October 2 and again on October 6. *Id.* at 3. JAMS responded that a copy of the invoice had been sent to Postmates (via its general counsel's office) on September 16; as noted, that invoice was "bill[ed] to" an outside attorney. *Id.* at 2.

During this time, Mesachi's counsel repeatedly attempted to get status updates from JAMS. Manthripragada Decl. Ex. J at 6. Finally, on September 15, JAMS responded that the arbitration would commence once it received the filing fee from Postmates. *Id.* at 5. Postmates's counsel quickly responded that "[a]s we have discussed, Postmates is waiting for JAMS to send an invoice addressed to Postmates. Our understanding is that JAMS is sending a revised invoice. Once Postmates receives a properly addressed invoice, it will promptly pay the fee. Postmates cannot pay invoices that are addressed to third parties. We'd be happy to schedule a call to discuss." *Id.* at 5. JAMS responded that the invoice was sent on September 15; again, that invoice was "bill[ed] to" an outside attorney. *Id.* at 4.

On October 5, Mesachi's counsel wrote that Postmates was in material breach of the

4

arbitration agreement under California Code of Civil Procedure § 1281.97(a) unless it had paid by September 30.  *Id.*  As a general matter, that statute gives a 30-day grace period after the "due date" for an employer to pay the filing fee in an arbitration; if it does not, California law places it in material breach of the arbitration agreement.  As noted, the original invoice stated the due date was August 31, 2020.  Postmates repeated some of the history of this invoicing process and stated that it "wanted to note that to date JAMS has yet to actually invoice Postmates . . . . Postmates cannot process an invoice that is not addressed to Postmates."  *Id.* at 3.  Nonetheless, Postmates paid JAMS the next day via credit card.  *See id.* Ex. K.  On its account, it did so because it "[r]ealiz[ed] that JAMS was not going to correct the invoice to allow the Accounts Payable team to process the invoice in the ordinary course."  Mot. 7.  JAMS confirmed that the arbitration would commence "shortly."  Manthripragada Decl. Ex. L.

The next day, October 7, Mesachi withdrew the arbitration claim.  *Id.*  He filed his complaint in this court on October 8.  Postmates now moves to compel arbitration.

## LEGAL STANDARD

The Federal Arbitration Act ("FAA") governs the motion to compel arbitration.  9 U.S.C. §§ 1 *et seq.*  Under the FAA, a district court determines: (i) whether a valid agreement to arbitrate exists and, if it does, (ii) whether the agreement encompasses the dispute at issue.  *Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004).  "To evaluate the validity of an arbitration agreement, federal courts should apply ordinary state-law principles that govern the formation of contracts."  *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1170 (9th Cir. 2003) (internal quotation marks and citation omitted).  If the court is satisfied "that the making of the arbitration agreement or the failure to comply with the agreement is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement."  9 U.S.C. § 4.  "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983).

## DISCUSSION

The parties here share much common ground.  They do not dispute that Mesachi agreed to

United States District Court
Northern District of California

the Fleet Agreement.  They do not dispute that the Fleet Agreement includes an agreement to arbitrate.  They do not dispute that this arbitration agreement covers Mesachi's employment claims against Postmates.

Instead, the core of Mesachi's objection to Postmates's motion to compel is that Postmates waited too long to pay JAMS and, by doing so, gave up its right to arbitrate these claims.  Mesachi argues this is so under California Code of Civil Procedure § 1281.97(a), enacted in 2019, which provides,

> In an employment or consumer arbitration that requires, either expressly or through application of state or federal law or the rules of the arbitration administrator, the drafting party to pay certain fees and costs before the arbitration can proceed, if the fees or costs to initiate an arbitration proceeding are not paid within 30 days after the due date, the drafting party is in material breach of the arbitration agreement, is in default of the arbitration, and waives its right to compel arbitration.

He also argues that Postmates forfeited its right to arbitrate even absent this statute under ordinary contract law because (1) he can rescind the contract due to Postmates's breach and (2) Postmates waived the ability to arbitrate through its behavior.  Postmates responds primarily that its payment was timely.  Alternatively, it argues that Section 1281.97(a) is preempted by the FAA and unconstitutional under the Contracts Clauses of the U.S. and California Constitutions.[2]

There is, however, a threshold question that must be addressed before Mesachi's objections to arbitrability: Did the parties delegate questions of arbitrability to the arbitrator?  For the reasons that follow, it is clear they did.  I must grant the motion to compel arbitration.

"[A]rbitration is fundamentally a matter of contract."  *Momot v. Mastro*, 652 F.3d 982, 986 (9th Cir. 2011).  As a general matter, parties may agree to arbitrate disputes so long as their agreement is consistent with the law.  But "gateway issues of arbitrability presumptively are reserved for the court."  *Id.* at 987.  These gateway questions typically include "whether the parties have a valid arbitration agreement or are bound by a given arbitration clause, and whether an arbitration clause in a concededly binding contract applies to a given controversy."  *Id.*  Even though judicial resolution, not arbitration, is the presumptive forum for disputes about

_____

[2] Mesachi contends that these preemption and constitutional arguments have been waived because they were referenced passingly in Postmates's Motion and only developed in its Reply.  Oppo. 11.

United States District Court
Northern District of California

arbitrability, "parties may agree to delegate them to the arbitrator." *Id.* As a result, "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). If arbitrability is clearly and unmistakably delegated to the arbitrator, a court must enforce that delegation "in the absence of some other generally applicable contract defense, such as fraud, duress, or unconscionability." *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1209 (9th Cir. 2016).

In *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63 (2010), the Supreme Court examined an arbitration clause that delegated to the arbitrator the question whether the arbitration agreement was unconscionable. 561 U.S. at 65–66. The Court applied its cases holding that arbitration is fundamentally a matter of contract and that parties could agree to arbitrate gateway issues under an "additional, antecedent agreement" to the primary arbitration agreement. *Id.* at 68–69. The Court explained that "[i]f a party challenges the validity . . . of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with that agreement." *Id.* at 71. But a challenge to the entire agreement rather than the specific arbitration provision does not trigger judicial determination. *Id.*

Put another way, a party seeking to invalidate an arbitration provision in court must challenge it specifically rather than the agreement it is a part of generally. *Id.* More importantly for present purposes, as the Court in *Rent-A-Center* went on to hold, a *delegation of arbitrability* is *itself* such an agreement that must be attacked specifically or it must be treated as valid and the enforceability of the agreement as a whole must be left to the arbitrator. *Id.* at 71–72.

Mesachi "concedes that his agreement with Postmates to arbitrate at JAMS clearly and unmistakably delegates arbitrability to the arbitrator." Oppo. 15. There is no dispute that the relevant versions of the Fleet Agreement included a delegation provision: "Only an arbitrator, and not any federal, state, or local court or agency, shall have the exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability, or formation of this Mutual Arbitration Provision." *See, e.g.*, Sunga Decl. Ex. B at 10. It also created two exemptions for class actions and representative actions that are not relevant here. *Id.*

United States District Court
Northern District of California

1    Mesachi's attempt at judicial resolution is foreclosed by *Rent-A-Center*, which is also the

2 only case Mesachi relies on for this point.  Mesachi's arguments are all threshold questions about

3 whether the arbitration agreement remains in force.  Although *Rent-A-Center* concerned an

4 unconscionability challenge, its reasoning appears to apply equally well to all gateway issues—

5 such as those Mesachi raises—and Mesachi offers no principled reason for distinguishing it.  *See*

6 *Henry Schein, Inc. v. Archer & White Sales, Inc*., 139 S. Ct. 524, 527 (2019) (explaining that,

7 under *Rent-A-Center*, the FAA "allows parties to agree by contract that an arbitrator, rather than a

8 court, will resolve threshold arbitrability questions as well as underlying merits disputes").

9    Mesachi resists this conclusion, but his arguments flip *Rent-A-Center* on its head.  With

10 respect to Section 1281.97(a), he argues that Postmates waived the right to compel arbitration

11 entirely and that "waiver is not limited" to the basic agreement to arbitrate but includes the

12 delegation provision.  Oppo. 15.  With respect to general contract law, he argues that his

13 arguments "would invalidate the *entire* agreement to arbitrate, *including* the delegation clause."

14 *Id.* 16 (emphasis added).  These are precisely the type of challenges that *Rent-A-Center* rejected.

15 Mesachi's attacks are not against only the delegation provision specifically, they are against the

16 arbitration agreement as a whole.  "[U]nless [Mesachi] challenged the delegation provision

17 specifically, [I] must treat it as valid under § 2, and must enforce it under §§ 3 and 4, leaving any

18 challenge to . . . the Agreement as a whole for the arbitrator."  *Rent-A-Center*, 561 U.S. at 72.

19 "Application of the severability rule does not depend on the substance of the remainder of the

20 contract," including when it is an agreement to arbitrate.  *Id.*

21    I grant the motion to compel arbitration because Mesachi's challenges to arbitrability have

22 been delegated to the arbitrator.  Mesachi does not contend that, even if the delegation provision is

23 valid and enforceable, it does not apply to his particular arbitrability challenges; accordingly, I do

24 not address that question.  This decision should be read for its narrow conclusion about delegation

25 of arbitrability, not as any comment on the arbitration agreement as a whole nor as approval of

26 Postmates's litigation conduct, including its use of an invoice it now claims was invalid to induce

27

28

Mesachi to dismiss his suit.[3]  Its conduct as alleged by Mesachi is concerning.  An arbitrator will determine whether the arbitration agreement is still enforceable in light of Postmates's actions.

### CONCLUSION

The motion to compel arbitration is GRANTED.  Accordingly, the parties are ordered to submit their claims to arbitration as provided by their agreement.  *See* 9 U.S.C. § 4.  This proceeding is STAYED pending resolution of the arbitration.  *See* 9 U.S.C. § 3.

The parties shall submit a joint status report six months from the date of this Order ad every six months thereafter until this matter is resolved.  Further, they shall notify the court within 14 days of the resolution of the arbitration, indicating whether the case should be dismissed or will proceed; if the latter, the parties should contact Ms. Davis, my Courtroom Deputy, to request a case management conference.  Postmates remains subject to my jurisdiction while the case is stayed and would open itself to weighty ramifications if it thwarted the arbitration for which it now pushes.

**IT IS SO ORDERED.**

Dated: January 8, 2021

_____
William H. Orrick
United States District Judge

---

[3] Postmates's attempt to pass off this interaction as innocuous is unconvincing.  It argues that "Postmates' counsel never stated that the invoice was proper, nor 'concealed' any facts from Plaintiff."  Reply 7.  That is specious.  The context is that Postmates was responding to Mesachi's repeated emails that, "[i]f they've sent you the invoice, please forward it to me and I'll file the dismissal," Kayes Decl. Ex. 3 at 2, and "[i]f they sent you the actual invoice, then I'll get the dismissal filed before your answer deadline Monday," *id.* Ex. 5 at 2.  Postmates then sent the invoice with no hint that it considered it invalid and Mesachi promptly dismissed the suit.

9